**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1962-22

CHRISTOPHER REGAN, DAVID
BONDY, TODD CONWAY,
FRED FARKOUH, CHARLES
FABRIKANT, EDWARD
MATTHEWS and ROBERT
BAILEY,

      Plaintiffs-Respondents/
      Cross-Appellants,

v.

BRAD CONWAY,

      Defendant-Appellant/
      Cross-Respondent,

and

HAZIM AUDALLA,

      Defendant,

and

CONTROL SCREENING LLC,
d/b/a AUTOCLEAR, LLC,

Intervenor-Respondent/
Cross-Appellant.

_____

Argued February 25, 2025 – Decided April 7, 2025

Before Judges Sumners and Perez Friscia.

On appeal from the Superior Court of New Jersey,
Chancery Division, Essex County, Docket No. C-
000123-11.

Anthony X. Arturi (Anthony X. Arturi, LLC) argued
the cause for appellant/cross respondent.

Nicholas A. Duston argued the cause for
respondents/cross appellants (Norris McLaughlin,
P.A., attorneys; Nicholas A. Duston and Matthew C.
Wells, on the briefs).

PER CURIAM

Defendant Brad Conway appeals from the Chancery Division's: (1) May

23, 2018, December 7, 2018, and June 3, 2019 orders confirming the arbitrator's

corresponding January 5, 2018, July 18, 2018, and December 13, 2018

arbitration awards in favor of plaintiffs Christopher Regan, David Bondy, Todd

Conway, Fred Farkouh, Charles Fabrikant, Edward Matthews, Robert Bailey,[1]

_____

[1] Throughout the opinion we reference individual plaintiffs collectively as
member plaintiffs.

2                                                                    A-1962-22

and Intervenor Autoclear, LLC f/k/a Control Screening, LLC (CS)[2] (collectively plaintiffs) and April 10, 2019 order denying reconsideration of the court's December 7, 2018 order; (2) November 18, 2022 order determining the fair value of Brad's[3] membership interest in Autoclear and January 24, 2023 order denying reconsideration; and (3) July 13, 2018 and May 23, 2018 orders granting plaintiffs' motion to enforce litigants' rights and awarding attorneys' fees and costs respectively.  Plaintiffs cross-appeal from the Chancery Division's:  (1) June 3, 2019 order partially vacating the arbitrator's final award, which had granted Autoclear reimbursement from Brad of 40% of its legal fees incurred during phase I of the litigation; and (2) November 18, 2022 order valuing Brad's membership interest in Autoclear using fair value rather than the tax book value. After reviewing the record, parties' arguments, and applicable legal principles, we affirm.

---

[2]  Throughout the opinion, we refer to Intervenor as Autoclear, as identified in the parties' briefs, rather than Control Screening, as identified in the caption.

[3]  As parties and their referenced family members share the same surnames, we use first names to avoid confusion.  We intend no disrespect by this informality.

I.

Litigation History

Autoclear is a closely held S-corporation formerly known as CS. Autoclear designs, manufactures, and services security screening equipment for the detection of weapons and explosives. It operates facilities in the Philippines, Canada, and New Jersey. Autoclear has operated with up to 300 employees. On April 1, 1995, CS members Granville Conway, Todd, and Brad entered an operating agreement. The operating agreement memorialized the merger of two predecessor companies and dissolved the members' interest in those companies. The operating agreement designated Granville, Todd's and Brad's father, as chairman, a capacity in which he served in until his passing in 2004, and Brad as the president. It is undisputed that Brad, an attorney, acted as Autoclear's chief executive officer (CEO). On December 12, 1996, Autoclear members elected Charles Fabrikant as a manager.

On October 30, 2010, Autoclear members voted to appoint a new Board of Managers, which included Brad and Todd. Brad disputed the validity of this vote. The new Board of Managers reconvened on May 9, 2011, and voted to limit Brad's decision-making abilities. Although invited, Brad did not attend. Thereafter, member plaintiffs filed an order to show case and verified complaint

4

in the Chancery Division seeking to enforce their votes and to enjoin Brad's management interference. On August 11, after Autoclear moved to intervene and compel arbitration, which Brad joined, the judge ordered the parties to proceed to arbitration under the operating agreement. Autoclear's operating agreement required that "[a]ny material dispute hereunder shall be decided in accordance with the rules of the American Arbitration Association [(AAA),] which award shall be final."[4] The judge denied member plaintiffs' requested injunction, which resulted in Brad remaining as the CEO. The arbitrator thereafter bifurcated the arbitration into two phases: phase I—Autoclear's control and management; and phase II—member plaintiffs' claims regarding Brad's breach of fiduciary duty, dissociation, and damages. Member plaintiffs' original claims in arbitration included: breach of fiduciary duty; breach of the operating agreement; member expulsion; and declaratory judgment.

On October 30, 2013, Brad entered a consent order settling a dispute between himself and Phyllis Conway, Todd's and Brad's mother, regarding the various trusts of which Brad was co-trustee. Brad was a co-trustee of the trusts, which held an interest in Cosmopolitan Shipping Company. Brad averred "the

---

[4] The parties do not dispute that the AAA rules, effective as of June 1, 2009, and applied by the arbitrator, governed the parties' arbitration proceedings.

A-1962-22

trusts at issue . . . owned Cosmopolitan, and therefore had the power and authority to vote Cosmopolitan's [m]embership interest in any [m]ember vote in [Autoclear]," and as co-trustee, any vote by the trusts required his approval. As part of the settlement, Brad resigned as a co-trustee, and Todd and Leslie Regan, Brad's and Todd's sister, were appointed co-trustees. Therefore, Brad lost control over Cosmopolitan's voting interest in Autoclear.

In November 2013, members of Autoclear elected a new Board of Managers, removing Brad from the Board. In January 2014, the Board of Managers removed Brad as CEO, prohibited him from entering Autoclear's property, eliminated him as a signatory on Autoclear's bank accounts, and appointed Todd as the interim CEO. At the time, Brad and Todd were the two largest membership interest holders in Autoclear with Todd holding approximately an 11.4% membership interest, and Brad holding approximately a 37% membership interest.

On January 2, 2014, the arbitrator issued a partial final award, finding Autoclear's members could "elect or remove [m]anagers by a majority vote of the [m]ember interests." He further determined that Autoclear's operating agreement provided managers the right to amend the operating agreement "without the consent of the [m]embers" only so long as "in [the managers'] . . .

6

opinion, such amendment d[id] not materially affect the [m]embers" and was "limited to . . . ministerial matters" as provided in Section 12B.

On April 1, 2014, the arbitrator permitted member plaintiffs to amend their statement of claims against Brad to assert new breach of fiduciary duty claims stemming from Brad's actions in 2013, including claims for attempting to cancel Hazim Audalla's membership and improperly attempting to move the company to Belize.

On December 10, 2014, the arbitrator issued an order addressing member plaintiffs' and Audalla's order to show cause requested relief. The arbitrator determined that the following actions were "ultra vires, illegal, [and] void in their entirety": any "purported amendments" to Autoclear's operating agreement that were "enacted during 2013[ and] 2014 at . . . Brad['s] . . . [m]anagers' meeting"; and any actions taken to move Autoclear's "registration from New Jersey to Belize," expel Autoclear's members, and file a "[c]omplaint in the Supreme Court of Belize."

On May 18, 2015, the arbitrator addressed member plaintiffs' application to declare Autoclear's loans to Brad void and to require his immediate repayment. Two promissory notes, both dated May 30, 2014, evidenced the

loans.  The arbitrator decided member plaintiffs' claims against Brad for unauthorized loans would be resolved in phase II of the arbitration.

On October 6, 2015, the arbitrator issued a partial final award, finding the 1995 operating agreement remained in full force and effect.  "[I]n accordance with [his] [d]ecision of January 2, 201[4]," he found Autoclear's Board of Managers was "to be appointed or removed by a majority vote of the [m]ember[] interests."  The arbitrator found the "Board of Managers appointed by the [m]embers at the November 16, 2013 meeting[] w[as] approved by a majority of the [m]ember [i]nterests and [wa]s validly constituted and empowered to act" pursuant to the operating agreement.  He further determined that all other alleged amendments to the 1995 operating agreement were "null and void."

On January 28, 2016, a second judge confirmed the arbitrator's October 6, 2015 partial final award.  The second judge stayed the award until February 8, 2016, permitting member plaintiffs to effectuate an orderly management transition with Brad.  The second judge ordered the parties to develop a transition plan, which included the necessary legal changes for banks, customers, and employees.  Additionally, he ordered Autoclear to continue operating in the ordinary course of business but prohibited any transfers, sales, or hypothecation of its assets.

A-1962-22

On February 8, 2016, the second judge lifted the stay and enforced the arbitrator's October 6, 2015 partial final award. The same evening, police were dispatched to Autoclear's Fairfield facility because an employee had removed computers and essential equipment at Brad's behest. The second judge ordered Brad and Autoclear affiliated individuals Jossette Caruso, Dr. Yawkuen Lin, and Te-Feng Fan to immediately return Autoclear's servers, hard drives, and equipment. On February 23, 2016, the second judge granted plaintiffs' order to show cause application for temporary restraints against Brad, Caruso, Lin, and Fan.

On June 7, 2016, the second judge granted plaintiffs' request for permanent restraints. He entered an order barring Brad, Caruso, Lin, and Fan from: interfering with Autoclear; entering its premises; contacting anyone affiliated with Autoclear; hypothecating Autoclear assets; taking any further steps to re-establish Autoclear's registration in Belize; utilizing Autoclear's backscatter imaging kit patent; and other various relief. He also ordered Brad to "immediately return all . . . computers, documents, cell phones, and any other devices or property." He specifically reserved on Autoclear's incurred attorneys' fees and costs due to Brad's theft, including the costs for the computer forensic analysis and repair of servers.

A-1962-22

On June 15, 2016, plaintiffs filed an amended complaint asserting phase II arbitration claims against Brad for: member expulsion pursuant to N.J.S.A. 42:2B-24; breach of fiduciary duty; breach of the operating agreement; and declaratory judgment.

In June 2016, after over four years of litigation before the same arbitrator, Brad requested the AAA convert the arbitration and apply its large, complex commercial dispute rules. Brad specifically argued plaintiffs' amended claims triggered the use of the AAA's large, complex commercial dispute rules and required three qualified arbitrators because plaintiffs demanded damages in excess of $1,000,000. Plaintiffs objected to Brad's request, arguing the amended claims mirrored their original claims, which included their "claim to enforce a vote, . . . a claim for breach of fiduciary duty, as well as [a claim] to disassociate" Brad. Plaintiffs argued the amended pleading was intended to memorialize that member plaintiffs and Autoclear were prosecuting the action together after the arbitrator's decision in phase I. Further, plaintiffs argued the AAA should not apply its large, complex commercial dispute rules and appoint three arbitrators because: Brad knew the value of plaintiffs' alleged damages from the filing of the original complaint; plaintiffs alleged no new claims but instead asserted additional damages based on Brad's malfeasance discovered during phase I;

plaintiffs would suffer prejudice from any delay and increased costs; Brad waived the use of the AAA's large, complex commercial dispute rules and three arbitrators; and the AAA should not award Brad's tactical gamesmanship.

On June 28, 2016, after reviewing the parties' submissions, the AAA concluded that "[i]n accordance with Rule [R-]37 of the [AAA r]ules[,] which govern this matter," the assigned arbitrator would continue handling the matter. AAA Rule R-37 addressed waiver and stated that "[a]ny party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with and who fails to state an objection in writing shall be deemed to have waived the right to object." Thereafter, the AAA declined Brad's request for reconsideration.

On January 5, 2018, the arbitrator entered a partial final award in favor of plaintiffs, voiding Autoclear's loans to Brad for $970,000 and requiring repayment. Two promissory notes dated May 30, 2014, for $830,000 and $140,000, memorialized the loans. The loans were unsecured and provided a five-year repayment term with a 2% interest rate. Autoclear had issued the loans after Brad held a telephonic meeting with Lin and Gil Zweig, who Brad alleged were on Autoclear's Board of Managers. Brad allegedly obtained the loans to fund his divorce. The arbitrator found the loans violated prior orders, and "[t]he

<span>A-1962-22</span>

undisputed facts clearly support[ed] a determination that [Brad] breached his fiduciary duty to" Autoclear. The arbitrator imposed a constructive trust on Brad's membership interest in Autoclear until he repaid his $700,000 loan balance.

On May 23, 2018, the second judge granted plaintiffs' motion in aid of litigants' rights under Rule 1:10-3 and denied Brad's cross-motion. In a comprehensive, sixty-eight-page oral decision, the second judge found Brad violated the arbitrator's and second judge's prior orders. He noted that after the arbitrator had awarded control of Autoclear to member plaintiffs, Brad held an emergency meeting and attempted to claim that Autoclear's members approved a resolution transferring authority back to him. The second judge found Brad's actions intentionally frustrated Todd's and other member plaintiffs' ability to manage Autoclear. The second judge recounted ordering temporary restraints on February 23, 2016, prohibiting Brad's from interfering with Autoclear, and permanent restraints on June 7, 2016. He found it relevant that Brad's wrongful conduct required police intervention.

A-1962-22

Further, Brad had filed multiple federal lawsuits[5] after June 7, 2016, including an action filed in the United States District Court for the Southern District of New York, which evidenced his contumacious behavior. The second judge ordered Brad to withdraw the New York federal action, except for permissible amended claims, and found Brad "patently . . . violat[ed]" the second judge's June 7, 2016 order. After copiously recounting Brad's violations, the second judge ordered Brad to pay plaintiffs' incurred attorneys' fees and computer forensic professional expenses as a coercive sanction. Lastly, the second judge confirmed the arbitrator's January 5, 2018 partial final award.

On July 13, 2018, after plaintiffs submitted certifications of service, the second judge found it appropriate to award plaintiffs $503,571.88 in attorneys' fees and costs. He reduced Autoclear's requested $554,157.82 sanction amount by: "the Canadian firm's fees" of $3,103.64; attorneys' fees and costs of $4,607 related to the motion to confirm the January 2018 award; $41,651.30 for the attorneys' fees and costs for the deposition of Caruso and Lin; and Nicholas Duston, Esq.'s duplicative fees totaling $1,224.

---

[5] On March 22, 2019, a Second Circuit Court of Appeals judge sitting by designation issued an order granting the "motions to dismiss [Brad's and Caruso's New York federal action] filed by AAA" and Autoclear. The Second Circuit Judge also sanctioned Brad in the amount of $20,898.34.

On July 18, 2018, the arbitrator issued a partial final award to plaintiffs, stripping Brad of his claimed newly-increased membership interest in Autoclear based on his approximately $1,000,000 in acquisition management fees (AMFs). Plaintiffs argued Brad "attempt[ed] to retroactively award himself 13 years[,] from 2001 to 2014[,] of AMFs totaling . . . approximately 8%" membership interest in Autoclear. The arbitrator found that while paragraph seven of the 1995 operating agreement stated that "managers shall receive an annual management fee" when certain conditions are met, "the actions of . . . [Autoclear] disclose[d] that the award of such fees was discretionary with the [Board of] [M]anagers." The arbitrator reasoned "the Board [of Managers] possessed the discretionary power to award management fees," but "[t]he [o]perating [a]greement d[id] not authorize the grant of membership interests in lieu of cash." He found that "[a]lthough the Board of Managers had the power to issue management fees, it had no authority to: a. [a]ward . . . [AMF]s; b. [a]ward membership interests in lieu of cash; or c. [a]ward any such fees retroactively from 2001 to 2014." The arbitrator held: Brad's claimed membership interests acquired in lieu of AMFs were "void and of no force"; the award of AMFs was to be expunged from Autoclear's records; and Brad's "membership interest in . . . [Autoclear] shall be adjusted accordingly." The

14

arbitrator's phase II partial final award voiding Brad's AMF membership interests therefore reduced Brad's 35.09163% membership interest in Autoclear that the arbitrator previously determined Brad possessed in phase I.

On December 7, 2018, a third judge was assigned to this case, and she confirmed the arbitrator's July 18, 2018 partial final award. The third judge confirmed Brad was not entitled to the AMFs, and his AMFs "totaling [approximately] $1,000,000[] from 2001 through 2014 [we]re . . . voided in their entirety." She also denied Brad's cross-motion to vacate the order, affording deference to the arbitrator's decision not to provide three arbitrators. She recognized AAA Rule R-37 provided for a party's waiver of its rules and found Brad waived any objection to not having three arbitrators because he had notice of plaintiffs' "claim for over . . . [$1,000,000] since 2015." She reasoned Brad failed to raise the issue before the second judge in January 2016, when the second judge confirmed the partial final award including claims valued "in excess of [$1,000,000]." Brad thereafter moved for reconsideration, which she denied on April 10, 2019.

After an August 9, 2018 telephonic scheduling conference, wherein Brad represented himself, the arbitrator ordered that the parties were to file all motions by September 10, and opposition by October 3. The arbitrator later

extended Brad's time to submit opposition to plaintiffs' summary judgment until October 15. In denying Brad a further extension, the arbitrator's October 23 order noted he previously afforded Brad "some leeway," but "[a]t some point, [the litigation] must stop."

On December 13, the arbitrator issued his final award after considering plaintiffs' summary judgment motion and Brad's cross-motion. In the arbitrator's written final award decision, he noted consideration of Brad's notice of application and brief. The arbitrator found: Brad "engaged in conduct" that made it unreasonable "to carry on [Autoclear's] activities . . . with him as a member"; Brad was to be dissociated and expelled as a member of Autoclear under N.J.S.A. 42:2C-46; Brad's membership interest in Autoclear was to "be sold as provided in N.J.S.A. 42:2C-47(c)"; Autoclear was to be reimbursed for Brad's $504,058.35 in personal attorneys' fees; Autoclear was to be reimbursed for Brad's personal legal fees of $70,975.36 related to the estate litigation; Autoclear was to be reimbursed for $314,730.14, constituting 40% of Autoclear's legal fees incurred in phase I; the membership interests of Katy Conway, Zweig, Bob Madden, Lin, Caruso, Jessica Conway, Ken Voigtland, and Tang were voided; Brad was required to pay 75% of the parties' AAA costs in the amount of $104,604.44; Brad's membership interests of $100,000 and

16

$136,000, which he caused Autoclear to issue, were voided; the membership interests of Brad's minor children, James C.B. Conway for $70,000, Granville K. Conway for $25,000, and Kathryn T. Conway for $100,000, were voided, and Autoclear was required to return his children's respective investments within ninety days; Autoclear's remaining claims were denied; and Brad's remaining claims were dismissed.

Regarding Brad's breach of fiduciary duty, the arbitrator stated Brad's conduct was "egregious in the blatant exercise of his power to greatly enhance his personal situation with utter lack of concern for the impact on . . . [Autoclear]." In awarding plaintiffs' attorneys' fees from phase I, the arbitrator relied on In Re Niles, 176 N.J. 294 (2003), and found the award was appropriate because Brad's "conduct was egregious." The arbitrator noted plaintiffs requested attorneys' fees of $786,825.25, and "it [wa]s difficult to allocate total responsibility for the various twists and turns of this arbitration." He determined that ordering Brad to "pay $314,730.1[0] (40%) . . . of [Autoclear's] legal fees" was appropriate. Regarding the AAA costs, the arbitrator cited AAA "Rule [R-]43" as providing the "authority to allocate fees and costs" and ordered Brad to pay "[75%] . . . of [Autoclear's] AAA fees and costs."

A-1962-22

On June 3, 2019, the third judge ordered a partial confirmation of the arbitrator's December 13, 2018 final award. The third judge issued a comprehensive, twenty-one-page written decision, which confirmed the award "except for the provision requiring [Brad] to pay . . . [40%] . . . of [Autoclear's] legal fees incurred in Phase I in the amount of $314,730.14." She reasoned the arbitrator's award of attorneys' fees plaintiffs incurred in phase I was against the "American Rule" and legally precluded, as "there was no agreement in this case that attorneys' fees [we]re to be awarded to the prevailing party, [and] the award of counsel fees [wa]s sustainable only if authorized by law in a similar civil action." She explained that under N.J.S.A. 2A:23B-23(a)(4), "an arbitral award must be vacated if 'an arbitrator exceeded [his] powers'" and determined "[t]he circumstances here require[d] . . . [her] to exercise [her] duty and intervene to prevent an award for attorney fees, as it would clearly violate New Jersey's long-standing public policy of disfavoring the shifting of attorney fees." The third judge's order confirmed the arbitrator's final award finding that: Brad was to be disassociated and expelled as a member of Autoclear under N.J.S.A. 42:2C-46; Brad's membership interest in Autoclear was to be sold; and Brad was to be afforded a buy-out. She also specifically found the arbitrator's denial of Brad's

further extension request to file opposition to plaintiffs' summary judgment motion was not an abuse of his discretion.

On August 9, 2019, after hearing Brad's motion to alter or amend her June 3, 2019 order, which confirmed the arbitrator's December 13, 2018 award, the third judge remanded the matter to the arbitrator for clarification. She ordered the arbitrator to clarify the "intended buy[-]out process," the methodology for valuation, and the date to be used for the valuation. On August 26, 2019, the arbitrator clarified that: "the valuation date [w]as the date of the [f]inal [a]ward"; the methodology "shall be determined by the [third judge]"; and he left to the third judge's "ability to determine the terms of the sale."

On January 21, 2020, the third judge appointed an independent expert to conduct a valuation of Brad's membership interest in Autoclear as of December 13, 2018, and thereafter modified the order to appoint Robert Bonavito, CPA, as the expert. On February 26, 2021, she entered a scheduling order for the parties' expert reports.

After a four-day trial, on November 18, 2022, the third judge issued an order accompanied by a cogent twenty-three-page decision finding that Brad's membership interest in Autoclear was 29.5% and had a discounted fair value of $1,250,153.95.

During the trial, the court's appointed expert, Bonavito, plaintiffs' expert, Hubert Klein, CPA, and Brad's expert, Gerard Giannetti, CPA, testified. The third judge admitted the experts' reports into evidence with the parties' consent. All three experts agreed that under the Internal Revenue Service Revenue Ruling 59-60, fair market value is defined as the "price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy[,] and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts." Further, all three experts noted Autoclear's cash balance in 2018 was higher compared to previous years because it had sold its building in Fairfield for $4,250,000 and moved its New Jersey facility to Pine Brook. The experts all agreed the arbitrator's voiding of Brad's $236,000 interest in Autoclear reduced Brad's membership percentage interest. It was further undisputed that the Board of Managers voted to include $3,389,533 as a "long[-]term liability" of Autoclear, representing "legal fees, a settlement agreement, and other expenses the company agreed to reimburse members." As of the valuation date, the long-term liabilities had been reduced to $2,829,472.

Bonavito's expert report provided that as of December 13, 2018, Autoclear's "fair value" was $7,200,000. Brad's membership interest was

35.333960% and valued at $2,544,045. Bonavito later adjusted Brad's membership interest to 29.532844% based on the phase II arbitration decision. Bonavito found "the appropriate methodology for valuing . . . [Autoclear] [wa]s a combination of [the] capitalization earnings method, the transaction multiple method[,] and [the] adjusted book value method." Bonavito determined that the fair value of Brad's 29.5% membership interest in Autoclear was $2,124,000. Bonavito determined that Autoclear's discounted fair value was $4,635,868 after applying a 19.5% minority discount and a 20% marketability discount.

Brad's expert Giannetti opined in his report that as of December 13, 2018, Autoclear's fair value was $8,430,930. Brad's membership interest was 35.33% and valued at $2,978,981. Giannetti also used a combination of the capitalization of earnings method, company transactions method, and the adjusted book value method. At trial, Giannetti testified he had failed to consider Autoclear's Philippines and Ottawa properties at their market value, which would have added $2,200,000 to Autoclear's adjusted book value. Accordingly, he testified that Autoclear's revised fair value as of December 13, 2018 was approximately $8,700,000. Giannetti also testified about another expert report he authored to "account[] for all adjustments confirmed in the arbitration award," which recalculated Brad's membership interest to 33.04%.

21

"Giannetti was the only expert to withhold . . . previous legal liabilities [that Autoclear assumed] from his calculations."  Further, he found a 19.5% minority discount and 10% marketability discount were appropriate.

The third judge discounted Giannetti's opinion regarding Brad's membership interest in Autoclear because he did not properly account for the $236,000 voidance of Brad's membership interests, which reduced Brad's membership interest in Autoclear.  Further, the third judge specifically found Giannetti's opinions did "not meet a standard of reasonableness upon which" she could rely.  She also reasoned his opinion was flawed because he based the "valuation conclusion . . . upon a single [OSI Systems, Inc. (OSI)] form letter" regarding the potential purchase of Autoclear, which was not "reliable enough to be . . . reasonably construe[d] . . . [as] a serious offer."

Plaintiffs' expert Klein opined in his report that as of December 13, 2018, Autoclear's fair value was $6,232,073.  Klein used a 29.76% membership interest for Brad based on the arbitrator's phase II share determination.  He noted that at the time of valuation, Autoclear had 36 partners and approximately 210 employees.  He reviewed financial records from 2014 through 2018 and determined Autoclear's gross receipts, gross profits, and the "resulting net income/(loss)."

In reaching his conclusion regarding Autoclear's fair value, Klein opined the most appropriate approaches for valuing Autoclear were the income approach and the asset approach. Klein explained that he did not utilize the market approach because "neither the guideline public company method nor the guideline transaction method were appropriate methods to value . . . [Autoclear] due to the limited number of transactions observed, as well as the comparability of the companies transacted to." He found Bonavito's market approach using the "merger and acquisition method (also known as the transaction method)" for Autoclear's valuation, which used "an [in]appropriate comparison" to American Science and Engineering, was "unusual," as it "rel[ied] upon one guideline transaction when applying the transaction approach." He opined that "Bonavito's conclusion of [Autoclear's] value based upon the transaction method should be disregarded." Klein further disagreed with Giannetti's market approach valuation of Autoclear, which relied on a "July 2, 2020 letter from OSI . . . to Autoclear," because it was not "a finalized sale offer" and not based on a review by OSI of "Autoclear's financials."

While Klein ultimately found the income approach inapplicable for Autoclear, he fully considered it using the capitalization of earnings method. He recognized the capitalization of earnings "method is utilized when . . . [a]

[c]ompany's historical earnings provide a reasonable proxy for future expectations." He explained that "the discounted future earnings method is employed when reliable projections are available," which did not exist for Autoclear. Therefore, he applied capitalization because "historical operating results were the best measure of . . . [Autoclear's] expected future earnings." In calculating Autoclear's fair value under the capitalization of earnings method, he "started with the pre-tax operating income" after deducting expenses and costs from Autoclear's gross profits. Klein thereafter found Autoclear's "resulting operating income/(loss) totaled ($1,693,844) in 2014, ($3,338,330) in 2015, ($1,075,343) in 2016, ($120,762) in 2017, and ($816,995) in 2018." After making "normalization adjustments," he calculated Autoclear's "adjusted pre-tax earnings to be ($607,142), ($1,963,432), $743,545, $315,308 and ($240,440) for the years 2014 through 2018." He excluded 2014 and 2015 unrepresentative significant losses. Ultimately, Klein "calculated the average adjusted pre-tax earnings to be $108,807."

Klein noted Autoclear "elected for 'S' Corporation status, . . . meaning that the individual [members] are responsible to pay income taxes on their applicable share of . . . [Autoclear's] taxable income." But, as "the rates of return utilized in the development of the capitalization rate, . . . utilize[] primarily Subchapter

24

C corporations' . . . after-tax data," he "appl[ied] a comparable tax rate to the pre-tax earnings stream," although "taxes are not paid on the [c]ompany level by Autoclear." He used the highest combined tax rate of 32%, resulting "in a projected after-tax income of $73,989." After concluding "the 'built-up' cost of equity" was 21.41%, and subtracting "[t]he long-term growth rate of 2[]%," Klein found a 19.41% capitalization rate. He used the "projected estimated cash flow of $73,989" "divided by the [19.41%] capitalization rate," which yielded a fair value for Autoclear of $381,189.

Under the asset approach, Klein "determined the net asset value . . . [was] the most appropriate method in which to value" Autoclear, "largely in part to the asset balance on . . . [Autoclear's] balance sheet as of December 31, 2018[,] which far exceeded the balance of . . . [Autoclear's] liabilities." In calculating the net asset value, Klein applied a 10% accounts receivable adjustment "to account for estimated uncollectible receivables." Klein also "adjusted the book value of fixed assets to account for the fair market value of real estate held by" Autoclear. After making the adjustments, he found the "net asset value of . . . [Autoclear] was $6,232,073."

After undertaking valuations under the income approach, using the capitalization of earnings method, and under the asset approach, using the net

25

asset value method, Klein concluded "the net asset value is more indicative of the value." He testified that "a company should be valued at no less than the book value of the company" because "if the operations are only worth $300,000, they would be better off selling the assets of the company[,] and they would realize $6[,200,000] million less the cost of selling the assets." He therefore afforded no weight to the capitalization of earnings method. Klein concluded Autoclear's fair value "as of December [13], 2018 was $6,232,073." He also found the application of a 20% minority discount and a 15% marketability discount were warranted. Ultimately, Klein found that as of December 13, 2018, the discounted fair value of Brad's 29.76% membership interest was $1,261,000.

Regarding Brad's membership interest, the third judge accepted Bonavito's "'straight math of taking $236,000 off of the value as of 2018'" reducing Brad's "interest . . . from 35.09163% to 29.532844%." She noted that Klein confirmed this analysis. After a detailed review of Klein's opinion regarding the income approach and the asset approach, the third judge found Klein's testimony was credible, and his opinion was "the most complete in both substance and proof." She found Bonavito's and Klein's "asset approach, [which they] agreed . . . [w]as the 'most appropriate approach,'" provided the most accurate valuation. She also determined Autoclear's decision "to place . . .

outstanding legal liabilities 'on the books'" because it "had agreed to take on any debt resulting from various litigations" was fully supported. She determined Autoclear's acceptance of legal liabilities was "an example of business judgment . . . not [to] be second-guess[ed]."

Finally, the third judge found the facts established that Brad was "an oppressor [member]," and member plaintiffs were oppressed after considering Brad's actions and the surrounding circumstances. She specifically found Brad's wrongdoings: were detrimental to Autoclear's members; had prolonged this litigation; purposely caused increased legal expenses to Autoclear's balance sheet; and devalued Autoclear under accepted appraisal methods. Accordingly, she found the "Oppressed Shareholder Statute," N.J.S.A. 14A:12-7(1)(c), (8)(a),

was "relevant to [her] decision."[6] She found that under N.J.S.A. 14A:12-7(1)(c), 8(a), a discount to fair value was appropriate. She determined that "in the interest of equity and upon consideration of the nature of Brad['s] . . . [membership] interest in Autoclear, . . . it [was] fit to apply both a marketability discount and minority discount to Brad['s]" membership interest. She relied on Klein's discount conclusions because his report had "the soundest analysis and most recent data" compared to Bonavito's report. Specifically, she found Klein credibly established, through his utilization of the Mandelbaum Factors,[7] a

---

[6] The parties do not contest the application of N.J.S.A. 14A:12-7. Effective March 1, 2014, the Revised Uniform Limited Liability Company Act (RULLCA), N.J.S.A. 42:2C-1 to -94, replaced the Limited Liability Company Act (LLCA), N.J.S.A. 42:2B-1 to -70. The RULLCCA provides for judicial dissolution of an LLC when "managers or those members in control of the company: (a) have acted, are acting, or will act in a manner that is illegal or fraudulent; or (b) have acted or are acting in a manner that is oppressive and was, is, or will be directly harmful to the applicant." N.J.S.A. 42:2C-48(a)(5). The court has the authority to "order the sale of all interests held by a member . . . if the court determines . . . that such an order would be fair and equitable to all parties under all of the circumstances of the case." N.J.S.A. 42:2C-48(b). As RULLCA affords analogous relief as provided under N.J.S.A. 14A:12-7(1)(c), (8)(a), the judge properly looked to existing shareholder oppression statutes regarding the buyout of a member's interests.

[7] The Mandelbaum factors are "[a] nonexclusive list of . . . factors" used to "[a]scertain[] the appropriate discount for limited marketability," which "appreciate[] the fundamental elements of value that are used by an investor in making his or her investment decision." Mandelbaum v. Comm'r, T.C. Memo. 1995-255, 1995 WL 350881 (1995), aff'd, 91 F.3d 124 (3d Cir. 1996).

28

foundation for a 15% marketability discount. She applied Klein's 20% minority discount for Brad's lack of control because Klein relied on "newer, indexed, and searchable" Mergerstat[8] "control premium studies" data.

Therefore, the third judge found Brad's membership "interest in Autoclear should be valued under the determinations made by . . . Klein in his expert report." Accordingly, she applied a 35% discount to Klein's fair value calculation of $6,232,073 and determined "the value of Brad['s] . . . 29.5% [membership] interest in Autoclear [wa]s $1,250,153.95."

On January 24, 2023, the third judge denied Brad's motion for reconsideration of her valuation decision and ordered Autoclear to pay "the net amount of $380,490.04." She explained in a twenty-four-page oral decision that defendant, by virtue of the June 3, 2019 judgment, owed Autoclear $869,663.91. She detailed that the $869,663.91 consisted of Brad's owed amount of $774,638.15 "plus post-[judgment] interest of $95,025.82." Therefore, Autoclear was ordered to buy out defendant for $380,490.04, which was the

---

[8] Bus. Valuation Res., 2024 FactSet Review: Excerpt 2 (2024), https://www.bvresources.com/products/factset-review-2024#look-inside-the-review.

third judge's valuation of Brad's membership interest at $1,250,153.95 minus his amount owed to Autoclear of $869,663.91.

On appeal, Brad contends: (1) it was a misapplication of law and public policy for the third judge to permit a majority in a membership case to vote the minority to be responsible for their legal fees, and that the "business judgment rule" permits circumvention of R. 4:42-9's limitations; (2) res judicata precluded the third judge from imposing a discount to fair value based on Brad's previous misconduct that was the subject of the arbitrator's final damage award; (3) the third judge should not have discounted the fair value of Brad's membership interest as it did not find "this case" was "extraordinary," and the prior monetary damage awards precluded such a finding; (4) the arbitrator's 2018 partial and final awards were invalid because the AAA's rules required three arbitrators to decide claims alleging more than $1,000,000 in damages; (5) the arbitrator's unreasoned decision denying Brad an extension to file opposition to plaintiffs' summary judgment motion constituted misconduct requiring vacatur; and (6) the second judge's sanction award of $503,000 against Brad was an abuse of discretion.

Plaintiffs cross-appeal contends the third judge erred in: vacating the portion of the final arbitration award that required Brad to reimburse Autoclear

A-1962-22

for 40% of the legal fees incurred during Phase I; and declining plaintiffs' application to use the tax book value as the appropriate valuation methodology.

## II.

## Arbitration

### A.

To give context to the arbitration issues presented, we begin by addressing our standard of review and the New Jersey Arbitration Act's (the Act), N.J.S.A. 2A:23B-1 to -36, governing statutory framework. We review a trial court's decision to affirm or vacate an arbitration award de novo. Sanjuan v. Sch. Dist. of W. N.Y., Hudson Cnty., 256 N.J. 369, 381 (2024). "[I]n reviewing a motion . . . [regarding] an arbitration decision, . . . we must be mindful of New Jersey's 'strong preference for judicial confirmation of arbitration awards.'" Ibid. (quoting Middletown Twp. PBA Loc. 124 v. Township of Middletown, 193 N.J. 1, 10 (2007)). The arbitration "award is not to be cast aside lightly" and may only be vacated "when it has been shown that a statutory basis justifies that action." Yarborough v. State Operated Sch. Dist. of Newark, 455 N.J. Super. 136, 139 (App. Div. 2018) (quoting Bound Brook Bd. of Educ. v. Ciripompa, 228 N.J. 4, 11 (2017)).

The Act grants arbitrators extremely broad powers.  Further, N.J.S.A. 2A:23B-15 "extends judicial support to the arbitration process subject only to limited review."  Barcon Assocs., Inc. v. Tri-County Asphalt Corp., 86 N.J. 179, 187 (1981) (interpreting the Act's predecessor, N.J.S.A. 2A:24-1 to -11).  "To foster finality and 'secure arbitration's speedy and inexpensive nature,' reviewing courts must give arbitration awards 'considerable deference.'"  Borough of Carteret v. Firefighters Mut. Benevolent Ass'n, Loc. 67, 247 N.J. 202, 211 (2021) (quoting Borough of E. Rutherford v. E. Rutherford PBA Loc. 275, 213 N.J. 190, 201 (2013)).  "An award may not be vacated or modified simply because a court disagrees with the arbitrator's interpretation of the law or view of the facts; unless the statute's specific requirements for vacating or modifying an award are met, the award must be confirmed."  Rappaport v. Pasternak, ___ N.J. ___, ___ (2025) (slip op. at 29) (citing N.J.S.A. 2A:23B-22).

Under the Act, a judge may vacate an arbitration award for the following limited reasons:

> (1) the award was procured by corruption, fraud, or other undue means;

> (2) the court finds evident partiality by an arbitrator; corruption by an arbitrator; or misconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding;

(3) an arbitrator refused to postpone the hearing upon showing of sufficient cause for postponement, refused to consider evidence material to the controversy, or otherwise conducted the hearing contrary to [N.J.S.A. 2A:23B-15], so as to substantially prejudice the rights of a party to the arbitration proceeding;

(4) an arbitrator exceeded the arbitrator's powers;

(5) there was no agreement to arbitrate, unless the person participated in the arbitration proceeding without raising the objection . . . not later than the beginning of the arbitration hearing; or

(6) the arbitration was conducted without proper notice of the initiation of an arbitration as required . . . so as to substantially prejudice the rights of a party to the arbitration proceeding.

[N.J.S.A. 2A:23B-23(a).]

N.J.S.A. 2A:23B-24 allows for modification of an arbitration award in certain limited circumstances, stating:

a. Upon filing a summary action within 120 days after the party receives notice of the award pursuant to section 19 of this act or within 120 days after the party receives notice of a modified or corrected award pursuant to section 20 of this act, the court shall modify or correct the award if:

(1) there was an evident mathematical miscalculation or an evident mistake in the description of a person, thing, or property referred to in the award;

33

(2) the arbitrator made an award on a claim not submitted to the arbitrator and the award may be corrected without affecting the merits of the decision upon the claims submitted; or

(3) the award is imperfect in a matter of form not affecting the merits of the decision on the claims submitted.

b. If an application made pursuant to subsection a. of this section is granted, the court shall modify or correct and confirm the award as modified or corrected. Otherwise, unless an application to vacate is pending, the court shall confirm the award.

c. An application to modify or correct an award pursuant to this section may be joined with an application to vacate the award.

"[T]he standard for modification set forth in N.J.S.A. 2A:23B-24(a)(2) . . . . has two mandatory components: that the award includes 'a claim not submitted to the arbitrator and the award may be corrected without affecting the merits of the decision upon the claims submitted.'" Rappaport, ___ N.J. at ___ (slip op. at 34) (emphasis in original) (quoting N.J.S.A. 2A:23B-24(a)(2)).

Pursuant to N.J.S.A. 2A:23B-15(a), arbitrators are permitted to "conduct an arbitration in such manner as the arbitrator considers appropriate for a fair and expeditious disposition of the proceeding." The authority conferred upon an arbitrator under N.J.S.A. 2A:23B-15(a) includes the power to hold

conferences with the parties before the hearing. It is clear that "when binding arbitration is contracted for by litigants, the judiciary's role to determine the substantive matters subject to arbitration ends." Minkowitz v. Israeli, 433 N.J. Super. 111, 134 (App. Div. 2013). Further, "there is a strong preference for judicial confirmation of arbitration awards." Id. at 135 (quoting Linden Bd. of Educ. v. Linden Educ. Ass'n, 202 N.J. 268, 276 (2010)). "In this context, the arbitrator's powers are limited by the agreement of the parties and an arbitrator may not exceed the scope of the powers granted to him or her by the parties." Kimm v. Blisset, LLC, 388 N.J. Super. 14, 25 (App. Div. 2006).

B.

We first address Brad's contention that the third judge erred in failing to vacate the arbitrator's 2018 awards, as the AAA wrongly denied his June 2016 request to apply the AAA's large, complex commercial dispute rules and appoint three arbitrators. Brad specifically argues the parties were bound to follow the 2009 AAA rules, and AAA Rule L-2(a) required large, complex commercial disputes to "be heard and determined by . . . three arbitrators . . . . [i]f the parties [we]re unable to agree upon the number of arbitrators and a claim or counterclaim involve[d] at least $1,000,000." Brad posits that because plaintiffs did not "specif[y] any amount of money" damages in phase I and thereafter

amended their pleadings in 2016 demanding over $1,000,000 in damages, he was entitled to change to an arbitration with three arbitrators. We are unpersuaded.

We begin noting that Brad argues the arbitrator's phase II awards were invalid and should be vacated under N.J.S.A. 2A:24-8, which applies to vacating an arbitration award related to a collective bargaining agreement. We surmise Brad intended to rely on the Act, N.J.S.A. 2A:23B-23(a). In reviewing whether the arbitrator exceeded his powers under N.J.S.A. 2A:23B-23(a)(4), the "judicial inquiry must consider more than whether a mere mistake occurred." Minkowitz, 433 N.J. Super. at 150. Rather, "the arbitrator[] must have clearly intended to decide according to law, must have clearly mistaken the legal rule, and that mistake must appear on the face of the award." Id. at 150-51 (alteration in original) (quoting Tretina v. Fitzpatrick & Assocs., 135 N.J. 349, 357 (1994)). Additionally, N.J.S.A. 2A:23B-23(a)(1) permits a judge to vacate an arbitration award "procured by . . . undue means"; this "ordinarily encompasses a situation in which the arbitrator has made an acknowledged mistake of fact or law or a mistake that is apparent on the face of the record." Sanjuan, 256 N.J. at 382 n.1 (alteration in original) (quoting Borough of E. Rutherford, 213 N.J. at 203).

Brad has failed to show either the AAA or arbitrator mistakenly applied the rules or made a mistake of fact or law. In the present matter, after Brad successfully moved in 2011 to transfer member plaintiffs' Chancery Division lawsuit to arbitration pursuant to Autoclear's operating agreement, a single arbitrator presided over the parties' dispute. Relevantly, member plaintiffs requested Brad's disassociation from Autoclear based on his alleged misconduct and alleged damages based on his alleged breach of fiduciary duty. In July 2011, member plaintiffs requested that the arbitrator determine the value of Brad's membership interest and void Brad's wrongfully transferred membership interest in Autoclear to himself. Hence, Brad was on notice of member plaintiffs' damages claims from the inception of the litigation.

The third judge correctly found the AAA was afforded deference in interpreting its rules and denying Brad's requested change to three arbitrators. See Howsam v. Dean Witter Reynolds, 537 U.S. 79, 84 (2002) ("'[P]rocedural questions which grow out of . . . [a] dispute and bear on its final disposition' are presumptively not for the judge, but for an arbitrator, to decide." (emphasis omitted) (quoting John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 557 (1964) (internal quotation marks omitted))). We observe that the AAA's rules did not address a request to apply the AAA's large, complex commercial dispute

37

rules and appointment of three arbitrators mid-arbitration after a party filed an amended pleading. Here, the parties were in their fifth year of arbitration when Brad made his request. The parties were well past AAA Rule L-1's required "administrative conference," which was to be held "within [fourteen] days after the commencement of the arbitration" and prior to the appointment of three arbitrators. If we were to accept Brad's argument that a party's filing of an amended pleading alleging over $1,000,000 in damages automatically permits a change to the AAA's large, complex commercial dispute rules, then a party could file a calculated amendment to forum shop and appoint three arbitrators after years with a single arbitrator. This further supports the deference afforded to the AAA in the application of its rules.

AAA Rule R-53 specifically states that "[t]he arbitrator shall interpret and apply these rules insofar as they relate to the arbitrator's powers" and "[a]ll other rules shall be interpreted and applied by the AAA." The AAA was in the best position to evaluate Brad's request and interpret its rules, which the parties agreed to. Therefore, we reject Brad's contention that the 2018 partial and final awards should be vacated, because the AAA acted well within its authority to review and decide whether his request to increase the number of arbitrators should be granted. N.J.S.A. 2A:23B-15(a).

We nevertheless address Brad's contention that the third judge erred in finding he waived the ability to request the AAA apply its large, complex commercial dispute rules and appoint three arbitrators after plaintiffs amended their pleading. Relevantly, Brad had notice that plaintiffs claimed over $1,000,000 in phase I. The arbitrator's May 18, 2015 letter memorialized that member plaintiffs sought to void Brad's Autoclear loans of $970,000, but the arbitrator had determined the issue would be addressed in phase II based on the parties' agreement "to bifurcate" the claims. The record demonstrates Brad was on notice that member plaintiffs were seeking: his disassociation from Autoclear; a determination of his buy-out value interest; and his repayment of the allegedly void $970,000 in loans. Thus, Brad, an attorney and Autoclear's prior CEO, was advised in 2015 that plaintiffs were litigating both the value of his approximately 30% interest in Autoclear and $970,000 in disputed loans, which combined were clearly in excess of $1,000,000. Yet, Brad failed to request the AAA apply the large, complex commercial dispute rules and appoint three arbitrators until over a year later in June 2016.

The third judge also correctly noted that Brad failed to raise the arbitration change before the second judge in January 2016 when he confirmed the partial final award "in excess of $1[000,000]." The record directly contradicts Brad's

assertion that he only learned in June 2016 that plaintiffs claimed he breached a fiduciary duty by wrongfully taking loans totaling $970,000. Further, while Brad had argued the loans were not subject to "an arbitral agreement," he was not foreclosed from alternatively requesting the AAA apply the large, complex commercial dispute rules. Notably, AAA Rule R-37 provided that "[a]ny party who proceed[ed] with the arbitration after knowledge that any provision or requirement of these rules ha[d] not been complied with and who fail[ed] to state an objection in writing shall be deemed to have waived the right to object." We therefore concur with the third judge's finding that Brad waived the election to have three arbitrators because he received ample notice since 2015 of plaintiffs' claims for breach of fiduciary duty and disassociation of his membership interest were worth over $1,000,000.

Further, Brad's status as an attorney and prior self-represented filings also wholly contradict his argument that his self-representation excused his failure to timely raise an objection to the use of one arbitrator. The record demonstrates Brad was clearly familiar with legal applications as evidenced by his litigation in the Supreme Court of Belize and federal court. "[B]ecause of the strong judicial presumption in favor of the validity of an arbitral award, the party seeking to vacate it bears a heavy burden." Minkowitz, 433 N.J. Super. at 136

40

(quoting Del Piano v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 372 N.J. Super. 503, 510 (App. Div. 2004)). Brad had sufficient knowledge to timely raise the issue of the AAA's large, complex commercial dispute rules. For these reasons, we discern no error in the third judge's December 7, 2018 order denying Brad's cross-motion to vacate the arbitrator's July 18, 2018 partial final award.

We next address Brad's argument that the third judge erroneously failed to vacate the arbitrator's final award because the arbitrator wrongly denied him a further adjournment to file opposition. He contends the arbitrator "did not specify why a denial was appropriate," and the failure to provide "stated reason[s]" was misconduct. While Brad cites N.J.S.A. 2A:24-8(c), the arbitration of collective bargaining agreements vacation of an award statute, we surmise he intended to argue under N.J.S.A. 2A:23B-23(a)(3), which permits a judge to set aside an award if "an arbitrator refused to postpone the hearing upon showing of sufficient cause for postponement."

As memorialized in the arbitrator's December 13, 2018 written decision, he considered Brad's self-represented "[n]otice of [a]pplication" and "[b]rief," but Brad failed to file opposition to plaintiffs' summary judgment motion by the set filing date of October 3, 2018. Brad's argument ignores that the arbitrator held a telephonic scheduling conference with the parties in August 2018 and

contemporaneously issued an order that set the filing date for substantive motions. The arbitrator thereafter granted Brad an extension to submit opposition by October 15, 2018 and explained the limited extension was based on Brad's "pattern" of "participation in . . . [a]rbitration." After Brad failed to file opposition, on October 17, 2018, the arbitrator "advised Brad by email 'that . . . any submission that was received by th[e] [AAA] after 5:00 p.m.[] on . . . October 18[, 2018,]' would not be accepted." Although Brad had filed the notice and a brief, he failed to file opposition. The record belies Brad's arguments that the arbitrator committed misconduct and failed to provide reasons for denying him a further extension.

We recognize that Brad retained counsel who requested another extension on October 22, 2018, to file opposition by December 14, referencing that Brad's ex-wife "had a mild stroke" that required Brad "to care for the[ir] children." Nevertheless, the arbitrator had the authority to determine that "[a]t some point, [the litigation] must stop" and deny another extension after previously "afford[ing] . . . leeway."

Pursuant to AAA Rule R-38, an arbitrator may grant extensions of time "for good cause . . . [as] established by the[] . . . [AAA's] rules, except the time for making the award." Further, AAA Rule L-4 permitted the arbitrator to

42

manage the proceedings by "tak[ing] such steps as they may deem necessary or desirable to avoid delay and to achieve a just, speedy and cost-effective resolution of [l]arge, [c]omplex [c]ommercial [c]ases." The arbitration had been ongoing for years, and AAA Rule R-30(b) provided in pertinent part that "[t]he arbitrator . . . shall conduct the proceedings with a view to expediting the resolution of the dispute."

Again, N.J.S.A. 2A:23B-15(a) provides an arbitrator wide authority to "conduct an arbitration in such manner as the arbitrator considers appropriate for a fair and expeditious disposition of the proceeding." The arbitrator had "broad discretion over discovery and other procedural matters." Minkowitz, 433 N.J. Super. at 144; see also Manger v. Manger, 417 N.J. Super. 370, 376-77 (App. Div. 2010) (stating that a party's "right to be heard" and "to present evidence material to the controversy" was not violated when the arbitrator declined to accept evidence after the parties failed to submit any by a pre-determined deadline). We discern no error in the third judge's order denying Brad's motion to vacate the award after she properly afforded deference to the arbitrator. For these reasons, we conclude Brad's argument that the arbitrator's "misconduct" warrants reversal of the third judge's orders refusing to vacate the partial and final awards are unavailing.

We turn next to plaintiffs' cross-appeal argument that the third judge erred in vacating the arbitrator's final award that ordered Brad to reimburse Autoclear for 40% of its legal fees—$314,730.10—incurred in phase I. Specifically, plaintiffs argue the third judge erroneously vacated the award provision after finding: there was no agreement between the parties permitting a prevailing party an attorneys' fees award; the arbitrator exceeded his powers by entering the fee award; and the award violated New Jersey's public policy disfavoring the shifting of attorney fees.

Notably, the Act limits an arbitrator's authority to award attorneys' fees and expenses. N.J.S.A 2A:23B-21(b) states, "An arbitrator may award reasonable attorney's fees and other reasonable expenses of arbitration if such an award is authorized by law in a civil action involving the same claim or by the agreement of the parties to the arbitration proceeding." It is undisputed Autoclear's operating agreement contained no provision permitting an award of attorneys' fees to a prevailing party. Therefore, under the Act, the arbitrator's fee award had to be authorized by law. As the third judge correctly found, "an arbitral award must be vacated if 'an arbitrator exceeded the arbitrator's powers.'" N.J.S.A. 2A:23B-23(a)(4).

A-1962-22

The arbitrator's attorneys' fee award relied on an analysis of the Supreme Court's opinion in Niles. We concur with the third judge's determination that "no exception to the American Rule was established under Niles" for legal fees incurred in corporate dispute involving "a breach of fiduciary duty in a direct action." The arbitrator's reliance on Niles was misplaced. In Niles, the Supreme Court held that in situations where "an executor or trustee reaps a substantial economic or financial benefit from undue influence, the fiduciary may be assessed counsel fees incurred by plaintiffs and third parties in litigation to restore the estate's assets to what they would have been had the undue influence not occurred." 176 N.J. at 286.

Outside of the fact that this case does not relate to trust litigation involving undue influence, plaintiffs extrapolate the holding in Niles, arguing Brad's breach of his fiduciary duty proximately caused Autoclear consequential damages of attorneys' fees, which Autoclear incurred from litigating phase I of this corporate dispute. Plaintiffs contort the meaning of attorneys' fees incurred by litigating against third parties, asserting "[t]he [a]rbitrator awarded legal fees as consequential damages Brad improperly caused . . . [Autoclear]—not . . . [member] [p]laintiffs—to incur against a third party," that being member plaintiffs. Plaintiffs' argument falls short because there were no attorneys' fees

charged to Autoclear "for representation of third parties in the litigation [that] should be reimbursed" by Brad for his breach of his fiduciary duty. <u>Niles</u>, 176 N.J. at 296. Member plaintiffs' attorneys' fees from phase I cannot fairly be viewed as consequential damages incurred for third party representation by Autoclear.

The third judge correctly found vacating the arbitrator's award was appropriate, as it was a violation of the long-standing public policy supporting the American Rule. She stated that "[i]f an arbitrator's decision on a question of public policy . . . plainly would violate a clear mandate of public policy," then a judge has the authority "to prevent the enforcement of the arbitration award." As the third judge soundly recognized, plaintiffs were not "forced to litigate a claim" with a third party "resulting from [Brad's] fiduciary breaches." Rather, the arbitrator considered Autoclear as the claimant, and the "fees incurred by . . . [Autoclear] . . . all related to [Brad's] breaches of fiduciary duty." We discern no error in the third judge's analysis that the misapplication of law violated New Jersey's firm public policy of applying the American Rule to an award of attorneys' fees. <u>See</u> <u>Weiss v. Carpenter, Bennett & Morrissey</u>, 143 N.J. 420, 443 (1996). The arbitrator exceeded his authority under N.J.S.A 2A:23B-21(b) by

shifting attorneys' fees to Brad, as no "award [wa]s authorized by law . . . or by the [operating] agreement."

In sum, we are unpersuaded by plaintiffs' unsupported contention that the arbitrator's award of $314.730.14 "was simply an award of consequential damages for Brad committing corporate waste." Therefore, we conclude the third judge correctly vacated the arbitrator's attorneys' fee award to plaintiffs, as "[a] court may vacate an arbitration award when it is procured by undue means or resulted from an arbitrator exceeding his designated powers." Minkowitz, 433 N.J. Super. at 150.

## III.

## Membership Interest Valuation

### A.

"There are [] few assets whose valuation impose as difficult, intricate and sophisticated a task as interests in close corporations." Steneken v. Steneken, 183 N.J. 290, 296 (2005) (alteration in original) (quoting Torres v. Schripps, Inc., 342 N.J. Super. 419, 435 (App. Div. 2001)). "[I]n the valuation of a business, '[t]here is no single formula that will apply to each enterprise.'" Ibid. (second alteration in original) (quoting Bowen v. Bowen, 96 N.J. 36, 44 (1984)). "Although there is no general formula that will apply to the 'many different

valuation situations,' the ultimate 'goal is to arrive at a fair market value" when "there is no market.'" Id. at 297 (quoting Bowen, 96 N.J. at 44). Our Supreme Court has long-recognized that "'[v]aluing a closely held corporation is a difficult task [that] . . . is fact sensitive and depends upon the experience of the appraiser and the completeness of the information upon which his conclusions are based [because] . . . the valuation of closely-held corporations is inherently fact-based and thus not an exact science.'" Id. at 297-98 (alterations in original) (quoting Torres, 342 N.J. Super. at 435). Our Court has elucidated that the three generally recognized approaches for valuing a closely held corporation "are the income or capitalized earnings method, the market approach method, and the cost approach method." Id. at 297.

We review a trial judge's "determinations, premised on the testimony of witnesses and written evidence at a bench trial, in accordance with a deferential standard." Nelson v. Elizabeth Bd. of Educ., 466 N.J. Super. 325, 336 (App. Div. 2021) (quoting D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013)). "[W]e defer to the trial [judge's] credibility determinations, because it '"hears the case, sees and observes the witnesses, and hears them testify," affording it "a better perspective than a reviewing court in evaluating the veracity of a witness."'" City Council of Orange Twp. v. Edwards, 455 N.J. Super. 261, 272

48

(App. Div. 2018) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)).  We will "'not disturb the factual findings and legal conclusions of the trial judge' unless convinced that those findings and conclusions were 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'"  Griepenburg v. Township of Ocean, 220 N.J. 239, 254 (2015) (quoting Rova Farms Resort v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)).

"The admission or exclusion of expert testimony is committed to the sound discretion of the trial [judge]."  Townsend v. Pierre, 221 N.J. 36, 52 (2015).  A trial judge has "wide discretion to accept or reject an expert's testimony, either in whole or in part."  Sipko v. Koger, Inc., 251 N.J. 162, 188 (2022) (citing Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div. 2002)).  Experts are required to "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'"  Townsend, 221 N.J. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)).  They must "be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable."  Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)).

"Our standard of review for valuation disputes is deferential because the valuation of closely held corporations is 'inherently fact-based[,]' not based in 'exact science,' and 'frequently become[s] battles between experts.'" Sipko, 251 N.J. at 179 (alterations in original) (quoting Balsamides v. Protameen Chems., Inc., 160 N.J. 352, 368 (1999)). However, "we need not give deference to the trial judge's determinations of what discounts or premiums the determination of fair value may include, or must exclude, since they are questions of law." Ibid. (quoting Casey v. Brennan, 344 N.J. Super. 83, 110 (App. Div. 2001), aff'd, 173 N.J. 177 (2002)). "Whether the corporation's fair value should be reduced by a marketability discount or any other discount is part and parcel of the fair value determination." Id. at 182.

The buyout section of the Oppressed Shareholder Statute, N.J.S.A. 14A:12-7(8)(a), states in pertinent part:

> (8) Upon motion of the corporation or any shareholder who is a party to the proceeding, the court may order the sale of all shares of the corporation's stock held by any other shareholder who is a party to the proceeding to either the corporation or the moving shareholder or shareholders, whichever is specified in the motion, if the court determines in its discretion that such an order would be fair and equitable to all parties under all of the circumstances of the case.
>
> > (a) The purchase price of any shares so sold shall be their fair value as of the date of the

commencement of the action or such earlier or later date deemed equitable by the court, plus or minus any adjustments deemed equitable by the court if the action was brought in whole or in part under paragraph 14A:12-7(1)(c).

## B.

We address together Brad's contentions that the third judge erred in applying a combined 35% discount to the fair value of Brad's membership interest in Autoclear because: plaintiffs had obtained a prior award of monetary damages against him for misconduct and the case was not extraordinary; and res judicata barred the application of any discount since "Autoclear had already pursued all potential damage claims . . . relate[d] to Brad's ownership of [membership interest] . . . and management during the arbitration." He specifically argues no discount related to membership oppression was warranted, this case did not present "extraordinary circumstances" warranting a discount reduction of $588,000 from his fair value, and the arbitrator's final award resulting in a $774,638.15 judgment was a final adjudication on the merits prohibiting any other remedy. After reviewing the record, we disagree and conclude the third judge's discount application was fully supported by the record.

51

The third judge applied a 20% minority discount and a 15% marketability discount to Brad's membership interest in Autoclear. We recognize at the outset that "[a] minority discount adjusts for lack of control over the business entity, while a marketability discount adjusts for a lack of liquidity in one's interest in an entity." Balsamides, 160 N.J. at 373. A minority discount may apply under "the theory that non-controlling shares of stock are not worth their proportionate share of the firm's value because they lack voting power to control corporate actions." Brown, 348 N.J. Super. at 483 (quoting Lawson Mardon Wheaton v. Smith, 160 N.J. 383, 398 (1999)). "Marketability discounts 'reflect the decreased worth of shares of stock in a closely held corporation, for which there is no readily available market.'" Sipko, 251 N.J. at 182 (quoting Balsamides, 160 N.J. at 375). Our Supreme Court has determined that "in deciding whether to apply a marketability discount to determine 'fair value' of shares of a shareholder forced to sell his stock in a judicially ordered buy-out must take into account what is fair and equitable." Balsamides, 160 N.J. at 377. "[N]either a marketability nor a minority discount should be applied absent extraordinary circumstances." Brown, 348 N.J. Super. at 483. "Depending on the facts . . . . '[a]pplication of the equities . . . [can] dictate[] opposite results.'" Sipko, 251 N.J. at 183 (alterations in original) (quoting Balsamides, 160 N.J. at 382).

52

Relevantly, our Supreme Court has "emphasized that N.J.S.A. 14A:12-7(1)(c) does not limit or preempt the courts' equitable power in fashioning appropriate remedies to a business dispute, specifically observing 'that the enactment of N.J.S.A. 14A:12-7 was not intended to supersede the inherent common law power of the Chancery Division to achieve equity.'" Sipko, 251 N.J. at 182 (quoting Brenner v. Berkowitz, 134 N.J. 488, 512 (1993)). The record in the present case, including the expert opinions, firmly supports that the third judge correctly determined discounts applied to the fair value of Brad's membership interest. The third judge correctly recognized that she was permitted to consider the expert opinions to provide context and a foundation for the fair application of a discount, but her decision to apply any discount had to be made based on a review of the totality of established facts. Further, in addressing whether Brad would receive "a windfall in a buy-out situation caused by his own bad conduct," the third judge was mindful not "to relitigate already settled matters" but recognized his actions were relevant to the application of discounts. In determining there were unremedied "equities" that weighed in favor of applying discounts to the fair value of Brad's membership interest, the third judge permissibly considered the detrimental effect of his misconduct addressed in arbitration, which resulted in plaintiffs' award of damages.

The third judge found Bonavito and Klein offered credible justification for their respective discount opinions, which were "comprised of satisfactory empirical data." She also made detailed findings regarding how Brad's misconduct detrimentally affected Autoclear. She found it relevant that Brad negatively impacted and devalued Autoclear by: attempting to "obfuscate his actual . . . [membership] interest" through transfers; attempting to reincorporate Autoclear in Belize; forcing Autoclear to incur greater legal expenses; and prolonging the litigation. She correctly noted that "oppressor . . . [members] should not be able to realize a beneficial windfall at the cost of oppressed . . . [members] during court ordered buy[-]outs triggered by the oppressor['s] own adversarial conduct."

Concurring with the third judge's findings, the record supports our conclusion that "fairness and equity . . . compel the decision to apply . . . a discount." Sipko, 251 N.J. at 183; see also id. at 184-85 (stating a standard rule regarding discounts cannot be applied because "[e]ach decision depends not only on the specific facts of the case, but also should reflect the purpose served by the law in that context" (alteration in original) (quoting Balsamides, 160 N.J. at 381)). The third judge fully weighed the equities in ordering the fair value of Brad's membership interest in Autoclear be subjected to a 20% minority discount

based on his lack of control in Autoclear and a 15% marketability discount based on the lack of a ready market. We reject Brad's argument that the discounts should be vacated because the third judge did not "make the [necessary] finding that the case was 'extraordinary.'" The third judge was not required to use the word extraordinary. She correctly found the discounts applied to Brad's membership interest after recognizing "discounts are appropriately applied when representative of the reality of the transaction, the nature of the interest being transacted and the bearing of equity upon the parties." Therefore, we discern no reason to disturb the third judge's findings that Brad "acted to the detriment of . . . Autoclear" members, and it was "in the interest of equity" to apply the minority and marketability discounts to his membership interest because they are sufficiently supported by credible evidence in the record.

Relatedly, we reject Brad's contention that res judicata barred the third judge's application of discounts. The arbitrator's and second judge's monetary awards were separate and distinct from the third judge's determination of the fair value of Brad's membership interest. As memorialized in the arbitrator's August 26, 2019 award, which clarified his findings, the December 13, 2018 final award ordered that Brad's "membership interests in . . . [Autoclear] shall be sold." Further, the arbitrator clarified that "[t]he methodology . . . shall be determined

by the [c]ourt upon . . . [plaintiffs] seeking confirmation of th[e] [f]inal [a]ward," and "the [third judge] would deal with all aspects of the sale, including valuation." The valuation of Autoclear and the fair value of Brad's membership interest were not arbitrated and were specifically reserved for a judicial determination.

The third judge's discount determination did not "doubly punish[] Brad for the same conduct." Rather, the arbitrator presided over different claims and found in favor of plaintiffs that: Brad's wrongly claimed AMFs of approximately $1,000,000 were void; Brad's repayment of the $700,000 Autoclear loan balance was required; and Brad repayment of $95,000 in medical expenses was mandated. Similarly, the second judge's enforcement of litigants' rights award under Rule 1:10-3, sanctioning Brad with plaintiffs' approximately $504,000 in attorneys' fees and costs, was also a separate claim and did not preclude the third judge from applying discounts.

"The doctrine of res judicata 'contemplates that when a controversy between parties is once fairly litigated and determined it is no longer open to relitigation.'" Selective Ins. Co. v. McAllister, 327 N.J. Super. 168, 172 (App. Div. 2000) (italicization omitted) (quoting Lubliner v. Bd. of Alcoholic Beverage Control, 33 N.J. 428, 435 (1960)). Res judicata fosters "the important

A-1962-22

policy goals of 'finality and repose; prevention of needless litigation; avoidance of duplication; reduction of unnecessary burdens of time and expenses; elimination of conflicts, confusion and uncertainty; and basic fairness.'" First Union Nat'l Bank v. Penn Salem Marina, Inc., 190 N.J. 342, 352 (2007) (quoting Hackensack v. Winner, 82 N.J. 1, 32-33 (1980)). Pursuant to res judicata, "a cause of action between parties that has been finally determined on the merits by a tribunal having jurisdiction cannot be relitigated by those parties or their privies in a new proceeding." Velasquez v. Franz, 123 N.J. 498, 505 (1991). Brad offers no authority for his proposition that discounts may not be applied after an award of damages for breach of fiduciary duty.

While the arbitrator and judges considered Brad's incidents of misconduct in their decisions, we conclude those claims and awards were clearly distinct from the fair value discount consideration of Brad's detrimental conduct. Therefore, Brad's argument that the third judge granted plaintiffs "another monetary award for the same conduct" is unsupported by the record. We discern no error in the third judge's determination that res judicata did not bar the third judge's application of discounts, which reflect the reality of the fair value of Brad's membership interest.

A-1962-22

Brad next argues the third judge erred in permitting Autoclear to assume plaintiffs' legal fees as a long-term liability, which resulted in a lower valuation of Autoclear and, therefore, a reduction in the value of Brad's 29.5% membership interest in Autoclear. He specifically avers the third judge incorrectly applied the business judgment rule to Autoclear's Board of Manager's vote to assume plaintiffs' legal fees because only member plaintiffs benefitted from the membership dispute, as opposed to all of Autoclear's members. Brad further contends member plaintiffs were permitted to "indirectly shift far more of their fees to Brad." We discern Brad's contentions are without merit.

"The business judgment rule has its roots in corporate law as a means of shielding internal business decisions from second-guessing by the courts." Alloco v. Ocean Beach & Bay Club, 456 N.J. Super. 124, 135 (App. Div. 2018) (quoting Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 175 (2011)). "To 'promote and protect the full and free exercise of the power of management given to the directors,' the second prong of the business judgment rule 'protects a board of directors from being questioned or second-guessed on conduct of corporate affairs, except in instances of fraud, self-dealing, or unconscionable conduct.'" Ibid. (quoting In re PSE&G S'holder Litig., 173 N.J. 258, 276-77 (2002)). "The

business judgment rule creates 'a rebuttable presumption.'" Id. at 136 (quoting In re PSE&G S'holder Litig., 173 N.J. at 277). "It places an initial burden on the person who challenges a corporate decision to demonstrate the decision-maker's 'self-dealing or other disabling factor.'" Ibid. (quoting In re PSE&G S'holder Litig., 173 N.J. at 277).

Brad's contention that plaintiffs engaged in self-dealing by litigating for their sole benefit is directly contradicted by the record. It is undisputed that there are over twenty-five other members with varying levels of membership interest in Autoclear and over 100 employees. The record demonstrates that Autoclear's members benefited from the management dispute litigation resolution, which resulted in the stabilization of Autoclear's governance and successful recovery of damages from Brad.

The record amply supports the third judge's findings that: "the litigation costs [were] . . . an example of business judgment"; "[t]he reasons articulated were sound"; and Brad failed to proffer sufficient evidence for her to "second-guess[] the decision of the company." Additionally, because the litigation benefited Autoclear, its reimbursement of the long-term liability does not constitute improper attorney fee shifting. While Brad accurately argues the long[-]term liability "'reduc[ed]' . . . his net equity interest[] in" Autoclear, all

members' interests were reduced. Brad failed to demonstrate any legitimate evidence rebutting the presumption that Autoclear's assumption of plaintiffs' legal fees as a long-term liability was not a sound and permissive business decision. Thus, we discern no error in the third judge's application of the business judgment rule regarding Autoclear's assumption of member plaintiffs' legal fees.

## C.

On plaintiffs' cross-appeal, they argue the third judge erred in denying their motions seeking a finding that "an implied agreement" to use the tax book value existed and consequently, that Brad's membership interest was to "be valued using [the] tax book value." They argue Autoclear's undisputed historical record of equity transactions, which all used the prior year's tax book value, established that the parties implicitly agreed that the tax book value was the accepted valuation methodology. Autoclear used the tax book value for over 100 equity transactions, but it is undisputed that each was for interest of approximately 2% or less. Plaintiffs argue Brad's membership interest valuation was bound to "Autoclear['s] historical methodology of referencing the book value on the prior-year's tax returns," as he had established and used while CEO. We are unpersuaded.

A-1962-22

It is uncontested that no written agreement to use the tax book value existed. Plaintiffs failed to meet their burden of proving Brad entered an implied agreement to use the tax book valuation method for his 29.5% interest in Autoclear. Valuing Brad's membership interest, which was more than double that of any other Autoclear member, was readily distinguishable from Autoclear's historic use of the tax book value for smaller interests. "An implied-in-fact contract is an agreement manifested by conduct rather than express written words." Cerkez v. Gloucester City, 479 N.J. Super. 174, 185 (App. Div. 2024). "Courts can find and enforce an implied-in-fact contract based on the parties' conduct considering the surrounding circumstances." Ibid.

We observe that had Autoclear incurred the cost of obtaining an expert valuation for each small equity sale and purchase, the valuation expense would have diminished the membership interest value for each transaction. Plaintiffs failed to establish Brad's conduct as CEO evinced an agreement to use the tax book valuation method. Therefore, we conclude the record sufficiently supports the third judge's finding that plaintiffs failed to establish an implied agreement between the parties to use the tax book value.

We note after trial, the third judge correctly denied plaintiffs' further request for the application of the tax book value recognizing, as the experts

posited, that utilizing the tax book value for Brad's membership interest produced a far lower valuation of Autoclear, which failed to reflect its "fair value." N.J.S.A. 14A:12-7(8)(a). She reasoned the tax book value of Autoclear did not include valuable real estate assets, which drastically reduced Brad's membership interest. It is clear that a trial judge may use "any techniques or methods which are generally acceptable in the financial community and otherwise admissible in court" to calculate fair value. Sipko, 251 N.J. at 182. Therefore, the record well-supports the third judge's findings that "[t]he tax book value cannot be considered fair under these circumstances," and "[t]he relevant statute requires the application of fair value."

IV.

Sanctions

Finally, Brad argues the second judge's award of approximately $504,000 in sanctions under Rule 1:10-3 warrants reversal. Specifically, he argues the second judge wrongly awarded plaintiffs "all of the fees and costs reasonably incurred from the 2016 temporary restraining orders, as well as the fees for defending the federal filings by Brad and fees for the second motion." Brad avers the second judge ignored that after Autoclear's control changed, Brad "honored the change in management" and did not "interfere[] with [Autoclear's]

operation."  He further contends the second judge also failed to consider lesser sanctions.

We review an "order enforcing litigant's rights under Rule 1:10-3 for an abuse of discretion."  Savage v. Township of Neptune, 472 N.J. Super. 291, 313 (App. Div. 2022), aff'd in part, rev'd in part on other grounds, 257 N.J. 204 (2024); Wear v. Selective Ins. Co., 455 N.J. Super. 440, 458-59 (App. Div. 2018) (awarding counsel fees under Rule 1:10-3 based on a party's continuous refusal "to comply with [court] orders").  Litigants may seek to enforce court orders under Rule 1:10-3.  "Specifically, 'Rule 1:10-3 provides a "means for securing relief and allow[s] for judicial discretion in fashioning relief to litigants when a party does not comply with a judgment or order."'"  Satz v. Satz, 476 N.J. Super. 536, 554 (App. Div. 2023) (alteration in original) (quoting N. Jersey Media Grp., Inc. v. State, 451 N.J. Super. 282, 296 (App. Div. 2017)).  "The scope of relief in a motion in aid of litigants' rights is limited to remediation of the violation of a court order."  Savage, 472 N.J. Super. at 312 (quoting Abbott v. Burke, 206 N.J. 332, 371 (2011)).  Nevertheless, if a judge "determines that a litigant has disobeyed an order," then he or she "has discretion and flexibility in fashioning an appropriate remedy to compel compliance."  Lipsky v. N.J. Ass'n of Health

Plans, Inc., 474 N.J. Super. 447, 463 (App. Div. 2023) (citing In re N.J.A.C. 5:96 & 5:97, 221 N.J. 1, 17-18 (2015)).

A judge "is not required to hold an evidentiary hearing on a Rule 1:10-3 motion unless there are material factual disputes concerning the parties' 'compliance with the order or ability to comply.'" Savage, 472 N.J. Super. at 312 (quoting State Dep't of Env't Prot. v. Mazza & Sons, Inc., 406 N.J. Super. 13, 29 (App. Div. 2009)). When seeking to enforce an order and obtain permissible coercive relief under Rule 1:10-3, the moving party is required to establish the opposing party's willful non-compliance. See In re N.J.A.C. 5:96 & 5:97, 221 N.J. at 18-19. Further, Rule 1:10-3 provides a judge "discretion [to] . . . make an allowance for counsel fees to be paid by any party to the action to a party accorded relief." Consequently, a fee award, which includes enforcement expenses, is authorized where a party willfully violates a court order or judgment. Hynes v. Clarke, 297 N.J. Super. 44, 57 (App. Div. 1997). However, a monetary sanction intended to be entirely punitive rather than coercive requires a summary contempt proceeding under Rule 1:10-2. See Ridley v. Dennison, 298 N.J. Super. 373, 381 (App. Div. 1997).

In May 2018, the second judge issued a sixty-eight-page cogent and comprehensive oral decision explaining why plaintiffs' motion to enforce

litigant's rights was granted and why Brad had to pay plaintiffs' attorneys' fees and costs. The second judge preliminarily recounted that he had purposely reserved decision in his June 7, 2016 order on plaintiffs' request for attorneys' fees and costs related to the order to show cause and the other requested expenses, which included forensic analysis and computer repair costs related to Brad's equipment theft. The second judge explained he mistakenly reserved on addressing an award of fees, believing it better to "see what happen[ed] in the future," but found the "threat of the financial sanctions did not work." He thereafter provided an extensive, detailed summary of the matter's long and tortured history.

The second judge ordered Brad to pay plaintiffs $503,571.88 in fees as sanctions for purposely violating the February 23, 2016, and June 7, 2016 orders. The record demonstrates the second judge was intricately familiar with the issues and orders in question, having presided over multiple Chancery Division proceedings between the parties over the course of four years. As the second judge noted, after plaintiffs had moved to enforce litigant's rights, Brad filed a notice of removal on February 13, 2018, with the United States District Court for the District of New Jersey, which the federal judge subsequently dismissed. On May 22, 2018, Brad again sought to remove the Chancery Division action to

65

the District Court of New Jersey, which the federal judge again dismissed, finding a lack of subject matter jurisdiction. The federal judge also warned Brad that any further filings may result in sanctions.

Brad also had a pending federal action filed in New York against plaintiffs and the AAA. Plaintiffs established that Brad, an attorney, "fil[ed] as much litigation as he c[ould] possibly handle," which severely jeopardized Autoclear. In ordering plaintiffs to submit a certification of attorneys' fees and costs, the second judge thoroughly explained why Brad's multiple federal actions, involving previously adjudicated issues, violated the June 7, 2016 order and "that financial sanctions [we]re warranted to compel Brad . . . to comply with" the prior orders. In contemplating the sanctions and seeking compliance with prior orders, the second judge recognized the New York federal action was still pending, and plaintiffs were still actively incurring costs to defend the matter.

On July 13, 2018, the second judge issued an amended order concerning plaintiffs' motion in aid of litigants' rights "to include attorneys' fees and costs related to" defending Brad's May 22, 2018 attempt to remove the Chancery Division action to the District Court of New Jersey. The second judge meticulously recounted Brad's violations from the time he ordered temporary restraints against Brad on February 23, 2016, through plaintiffs' enforcement of

litigants' rights motion.  He reiterated that "while plaintiffs made a compelling argument" in June 2016 regarding Brad's actions "to frustrate the [c]ourt's orders, [he had] thought it . . . appropriate to reserve on the award of counsel fees."  Notably, the second judge found Brad's "action[s] would have permitted an award of the attorneys['] fees on June 7[], 2016" and highlighted Brad's direct "theft of . . . [Autoclear's] computer services," "interfere[nce] with the new management['s] control," and the multiple federal lawsuits Brad filed.  After reviewing the reasonableness of the fees claimed and proofs submitted regarding Brad's "shocking conduct," he discounted certain fees and costs that had no clear nexus with Brad's violations.

Based on Brad's contumacious and willful disregard of the second judge's orders and the established necessity to order coercive sanctions, we discern no error in the award of approximately $504,000 in attorneys' fees and costs.  We recognize such a high award is atypical to effectuate compliance.  The record, however, substantiates that Brad violated the orders and "continually" threatened Autoclear's ability to function after the second judge reserved on an award of attorneys' fees and costs to plaintiffs.  The second judge was familiar with the parties' interests in Autoclear from presiding over the parties' matter for years; therefore, we discern no error in the second judge's lack of specific ability

to pay findings.  We note that Brad did not specifically raise an inability to pay before the second judge.  Because Brad's actions placed Autoclear's "very survival . . . at stake," the second judge's award imposing attorneys' fees and costs was appropriate relief.

To the extent that we have not addressed the parties' remaining contentions, it is because they lack sufficient merit to be discussed in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1962-22